UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - )
)
NEUROLOGICAL SURGERY PRACTICE OF LONG )
ISLAND, PLLC, )
)
                          Plaintiff, )    **COMPLAINT**
)
             vs )    Case No.  1:23-cv-2977
)
UNITED STATES DEPARTMENT OF HEALTH AND )
HUMAN SERVICES; UNITED STATES )
DEPARTMENT OF THE TREASURY; UNITED )
STATES DEPARTMENT OF LABOR; XAVIER )
BECERRA, in his official capacity as Secretary, United )
States Department of Health and Human Services; JANET )
YELLEN, in her official capacity as Secretary, United )
States Department of the Treasury; and JULIE A. SU, in )
her official capacity as Acting Secretary, United States )
Department of Labor, )
)
                     Defendants. )
)
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

       Plaintiff, Neurological Surgery Practice of Long Island, PLLC, by its attorneys, Harris

Beach PLLC, for its Complaint against the Defendants, United States Department of Health and

Human Services; United States Department of the Treasury; United States Department of Labor;

Xavier Becerra, in his official capacity as Secretary, United States Department of Health and

Human Services; Janet Yellen, in her official capacity as Secretary, United States Department of

the Treasury; and Julie A. Su, in her official capacity as Acting Secretary, United States

Department of Labor (collectively, the Defendants will be referred to as the "Departments", alleges

as follows:

## PRELIMINARY STATEMENT

1.     Plaintiff, Neurological Surgery Practice of Long Island, PLLC (the "Practice"), is one of the largest private neurosurgery practices in the New York metropolitan area. Its award-winning specialists are among the best neurosurgeons in the area and serve as chiefs of neurosurgery in the most prestigious hospitals on Long Island.

2.     Historically, the Practice, like many other independent medical specialty groups, has chosen in most cases not to join health plan networks, because its relatively small size makes it impossible to negotiate acceptable rates. Accordingly, neither the Practice nor its neurosurgeons are health plan participating providers in most cases.

3.     Notwithstanding this, however, the Practice regularly provides medically necessary, covered services on an "out of network" and often emergency basis to enrollees and beneficiaries of all health plans. The Practice's provision of these services since January 1, 2022, has been governed (in most cases) by the No Surprises Act, Public Law No. 116-260.

4.     Congress passed the No Surprises Act in December 2020 after extensive bipartisan and bicameral deliberations. Its purpose was to prevent patients from having responsibility for medical bills from non-contracted medical providers with whom their private health plans had failed to reach adequate payment agreements. To solve this problem, medical providers were required to hold patients harmless for anything above what the patient would have paid for an in-network service.

5.     If the provider and health plan could not come to a mutually satisfactory payment amount, Congress created a quick and fair independent dispute resolution (IDR) process, based largely on the "baseball style arbitration" process first created in New York State pursuant New York Financial Services Law §§ 601-08, *et seq.* . The New York process, which started in 2015, demonstrated that this process could be run in a quick, fair, and inexpensive manner. Furthermore,

because the process was run efficiently and effectively, almost all disputes were negotiated between parties without going to IDR.

6. Accordingly, the No Surprises Act set out, in specific detail, a very similar process. Both provider and health plan were directed to provide a wide range of relevant data (with few exceptions) for consideration by the IDR entity, including a datapoint called the Qualified Payment Amount (QPA). The QPA was a figure used to determine what the patient would owe and was intended to reflect a median of contracted rates for that health plan and that region.

7. Very short and specific time frames were set out for the IDR entity to make its determination and for the health plan to make its additional payment if it lost. It was the responsibility of the Departments to oversee this process. Accordingly, the Act set forth tight timeframes and deadlines for the IDR process to ensure that there is a predictable and efficient process designed to enable providers to be reasonably and appropriately reimbursed for the medically necessary, and often lifesaving treatment, they provide health plan beneficiaries.

8. As alleged in detail below, the Departments' unlawful implementation of the No Surprises Act has put the Practice and other similarly situated out-of-network providers jeopardy of imminent financial collapse. This would not only have a disastrous impact on healthcare access, quality, and cost, but also would create significant liabilities for all involved because of the financial damages that these providers sustained as a result of the destruction of their practices due to the Departments acting way beyond any rational authority. Such unlawful and *ultra vires* conduct has trammeled upon the constitutional, statutory, and property rights of the Practice and other similarly situated out-of-network providers.

9. In general terms, the Departments' illegal and improper actions and inactions have caused three major problems:

- The Departments are not processing IDR claims in the required timeframe.

- The Departments are routinely allowing IDR eligible claims to be rejected.

- The Departments are allowing health plans to avoid paying claims they lose at IDR.

10.     Rather than overseeing the IDR process, and providing regulatory enforcement of the law, the Departments, whose interest seem to align almost exactly with that of the nation's giant health plan monopolies, have sabotaged the process, essentially rewriting the law. Indeed, although the No Surprises Act has been in effect for more than 16 months, hardly any IDR claims have been processed. For those that have been processed favorably for the providers, the Departments have allowed the plans to avoid paying. As such, the Act might as well have said "for out of network services, insurers will pay providers whatever they feel like paying". Given all this, it should come as no surprise that United States health plan companies enjoyed record profits last eyar.

11.     The No Surprises Act is clear that the nation's health plan giants are not obligated to offer contracts to non-contracted medical providers, are not obligated to make any payments to non-contracted medical providers and are not required to negotiate with non-contracted medical providers. The specific and only remedy that doctors, hospitals, ambulances, and other medical providers have for health plan failure to make appropriate payment, is the IDR process. It is for exactly this reason, that it was crucial to create a process that would be not just fair, but also quick and inexpensive. The Departments have failed in this endeavor.

12.     Indeed, The Departments have already lost twice in federal court over their efforts to unlawfully skew the IDR process in favor of the QPA (and the health plans). They have forced medical providers to sue them yet another two times, once regarding their unlawfully creating a method for QPA calculation that deliberately, and significantly, lowers the amount, and again over

their unlawful creation of a $350 non-refundable administrative fee that is making accessing the IDR process prohibitively expensive for many medical providers.

13.     The actions that the Departments have taken regarding the operation of the federal IDR represent a deliberate attempt to deviate from the language and intent of the No Surprises Act, to do the bidding of the for-profit health plan companies, and to destroy thousands of medical provider entities that are now entirely dependent on the federal IDR process for reimbursement. To avoid catastrophic consequences to the American healthcare system, this Court must exercise its statutory authority to compel the Departments to honor their specific statutory obligations under the No Surprises Act with respect to the establishment and operation of a fair, quick, and inexpensive federal IDR process. Without such relief, the Practice, and many other similarly situated out-of-network health care providers, will be forced out of business, thereby denying healthcare access to millions of Americans.

## PARTIES

14.     Plaintiff, Neurological Surgery Practice of Long Island, PLLC, is a New York professional service limited liability medical company with its principal place of business located at 100 Merrick Road, Suite 128W, Rockville Centre, New York.

15.     Neurological Surgery Practice of Long Island, PLLC was formed in August 2020, and, because of a merger in December 2020, is the corporate successor of Neurological Surgery, P.C.

16.     Defendant United States Department of Health and Human Services is one of the three federal executive departments that Congress charged with implementing and administering the No Surprises Act.

17.     Defendant United States Department of the Treasury is another one of the three federal executive departments that Congress charged with implementing and administering the No Surprises Act.

18.     Defendant United States Department of Labor is the final one of the three federal executive departments that Congress charged with implementing and administering the No Surprises Act.

19.     Defendant Xavier Becerra is the presidentially nominated and senatorially confirmed Secretary of the United States Department of Health and Human Services. Secretary Becerra is sued in his official capacity only.

20.     Defendant Janet A. Yellen is the presidentially nominated and senatorially confirmed Secretary of the United States Department of the Treasury.  Secretary Yellen is sued in her official capacity only.

21.     Defendant Julie A. Su is the duly appointed Acting Secretary of the United States Department of Labor. Acting Secretary Su is sued in her official capacity only.

## JURISDICTION AND VENUE

22.     The Court has jurisdiction over this action under 28 U.S.C. § 1331 and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–06. The Practice is entitled to the requested declaratory and injunctive relief under the APA and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02.

23.     Venue is proper in this judicial district under 28 U.S.C. § 1391(e) because this is an action against officers and agencies of the United States, the plaintiff resides in this district, and no real property is involved in this action

## FACTS COMMON TO ALL CAUSES OF ACTION

## NSPC

24.     Neurological Surgery Practice of Long Island, PLLC (the "Practice"), is one of the largest private neurosurgery practices on Long Island and in the New York metropolitan area. Its award-winning specialists are among the best neurosurgeons in New York City and on Long Island and serve as chiefs of neurosurgery in the most prestigious hospitals on Long Island.

25.     Historically, the Practice, like many other independent medical specialty groups, has chosen in most cases not to join health plan networks, because its relatively small size makes it impossible to negotiate acceptable rates. Accordingly, neither the Practice nor its neurosurgeons are health plan participating providers in most cases. Notwithstanding this, the Practice regularly provides medically necessary, covered services on an "out of network" and often emergency basis to beneficiaries of all health plans.

## The No Surprises Act

26.     In December 2020, the United States Congress enacted the No Surprises Act, which was signed into law as part of the Consolidated Appropriations Act of 2021 (Public Law 116-260; Division BB § 109) on December 27, 2020. It took effect on January 1, 2022.

27.	No Surprises Act § 103 amends 42 U.S.C. §§ 300gg *et seq*. to establish an IDR process for non-emergency services performed by non-participating physicians at in-network hospitals, hospital outpatient departments, critical access hospitals, and ambulatory surgical centers and out-of-network emergency services in the emergency department of a hospital or independent freestanding emergency department

28.	The No Surprises Act provides that the federal IDR process will apply and may be used by physicians and health plans to determine the out-of-network rate for emergency services in the emergency department of a hospital or independent freestanding emergency department and non-emergency items and services furnished by non-participating providers during a visit to a participating health care facility when a "specified state law" does not apply (42 U.S.C. § 300gg-111).

29.	Since the No Surprises Act became effective on January 1, 2022, the Practice's reimbursement for many of these services has been governed by the provisions of the Act.

**Failure to Address Health Plan Initial Payment Delays**

30.	The No Surprises Act prohibits out-of-network providers, such as the Practice, from balance billing or otherwise pursuing payments from health plan members. *See* 42 U.S.C. §§ 300gg-131(a) (emergency services), 300gg-132 (non-emergency services performed by nonparticipating providers at participating facilities).

31.	Given this balance billing ban imposed on out-of-network providers, the Act requires health plans, within 30 calendar days after the out-of-network provider transmits its bill to the health plan, to either make an initial payment to the provider or issue a notice of denial of

payment. *See id.* §§ 300gg-111(a)(1)(C)(iv) (emergency services), 300gg-111(b)(1)(C) (non-emergency services).

32.     Since the No Surprises Act became effective in January 2022, the health plans have almost completely failed to comply with this 30-day timeframe. Because of the balance billing ban imposed by the Act, each day that the health plans fail to comply with the 30-day deadline marks yet another day that the Practice does not get paid *anything* for the medically necessary treatment that it provided the health plan's beneficiaries.

33.     There is nothing in the Act that allows the Practice to stop or avoid paying for the costs incurred in providing this treatment, so not only is the Practice not receiving any reimbursement for the treatment, but it still must also pay for all costs incurred in rendering that treatment. This, therefore, is an economically untenable situation.

34.     The Departments are certainly aware of the health plans' almost complete failure to comply with the 30-day timeframe. Indeed, many complaints have been to the Departments regarding this issue by health care providers (including the Practice), and physician advocacy organizations. There have also been extensive discussions in the trade press regarding this issue of health plan delays.

35.     Regardless, while many complaints have been made to the Departments regarding the plans' failure to honor these statutory timeframes, these complaints have all fallen on deaf ears, creating a situation where the Departments are tacitly, if not expressly, approving the plans' delay tactics and denial of compensation for the medically necessary services provided.

36.     When the plans do make initial payments – oftentimes beyond the statutory period – to the Practice as required by 42 U.S.C. §§ 300gg-111(a)(1)(C)(iv) and 300gg-111(b)(1)(C), those initial payments are abysmally low, far below the out-of-network reimbursement payments that the Practice received in the months before the No Surprises Act became effective for the same services at the same location. In most cases, these initial payments have been below the Medicare reimbursement rate for the services, notwithstanding that the Medicare rate was rejected by Congress as a factor to consider in the IDR process because of it being artificially low and significantly below market.

37.     Also, in direct contravention of the No Surprises Act – particularly 42 U.S.C. §§ 300gg-111(a)(1)(C)(iv) (emergency services), 300gg-111(b)(1)(C) (non-emergency services) – payments, when made by the plan, are often sent directly to the patients. This forces the Practice to have to retrieve the payment from the patients, resulting in delays and a resulting inability to honor the Practice's timeframes under the No Surprises Act.

38.     There are many more problems with the health plans' initial communications regarding payment. For example, the Departments failed to require health plans to clearly state on their explanation of benefit (EOB) forms their understanding of whether the case is IDR eligible and in which venue (federal or state). This would immediately reduce the problem of health plans declaring numerous cases to be "ineligible." IDR entities are routinely dismissing cases just because health plans declare them to be ineligible, which health plans declare regularly, and usually, incorrectly.

39.     Likewise, the Departments have not required health plans to present an exact value of their QPA in the EOB. This has also made it difficult to process the cases at IDR. The Departments

also have not required a quick and easy and accurate process for medical providers to ask questions and resolve issues related to the IDR process. It is impossible for medical providers to reach CMS or the IDR entities by phone, and emails are responded to very slowly and often, with inaccurate responses. Among other things, this makes it very hard for medical practices to comply with the strict timeline requirements set out in the law.

**Substantial IDR Process Delays**

40.     There is no incentive for the health plans to provide anything but a *de minimis* initial payment, because, given the current delays in the IDR process (as we detail below), it will be many months, if not years, before there is any realistic chance for them to be held to account for their initial low payment. It is no doubt in their view that it far better to retain the appropriate reimbursement funds in their coffers – and thereby pressure the Practice and other similarly situated providers to accept low in-network rates – than to pay a reasonably appropriate amount in the first instance to providers such as the Practice.

41.     Of course, the obligations of the Practice to render medically necessary care and to incur and pay for the ever-increasing costs of providing that care continue unabated during this process; the only thing that has changed is that the Practice is not receiving anything more than far-below cost, minimal reimbursement for providing that care.

42.     One of the biggest problems facing the Practice and other similarly situated providers is the long delays and uncertainty in the IDR process. Congress established an open negotiation period between health plans and providers coupled with a balanced IDR process employing tight timeframes and deadlines to ensure that there is a predictable and efficient process

designed to enable providers to be reasonably and appropriately reimbursed. However, this is not what has occurred.

43.     For example, it has been the Practice's consistent experience during the 14 months that the No Surprises Act has been in effect that health plans have steadfastly refused to engage in meaningful open negotiations with it regarding reimbursement rates, as required by the Act. 42 U.S.C. § 300gg-111(c)(1)(A). Accordingly, virtually every reimbursement claim submitted to the health plans has been forced into the IDR process. Due to the plans' bad faith conduct, the statutory 30-day negotiation period has become nothing more than another 30-day delay of reimbursement to the Practice for the medically necessary treatment it provided the plans' beneficiaries.

44.     The Departments are certainly aware of the health plans' bad faith negotiating practices. Indeed, many complaints have been to the Departments regarding this issue by health care providers (including the Practice), and physician advocacy organizations. There have also been extensive discussions in the trade press regarding these bad faith negotiating tactics. Yet, the Departments have failed to address this issue and compel the Plans to act in good faith and in compliance with their statutory obligations.

45.     Additionally, there has been a complete failure by the Departments to follow and observe the tight time frames established in the No Surprises Act for the IDR process. The Act specifically states:

> Not later than 30 days after the date of selection of the certified IDR entity with respect to a determination for a qualified IDR item or service, the certified IDR entity shall—
>
> (i)  taking into account the considerations specified in subparagraph (C), select one of the offers submitted under subparagraph (B) to be the amount

of payment for such item or service determined under this subsection for purposes of subsection (a)(1) or (b)(1), as applicable; and

(ii) notify the provider or facility and the group health plan or health insurance issuer offering group or individual health insurance coverage party to such determination of the offer selected under clause (i).

42 U.S.C. § 300gg-111(c)(5)(A).

46.     Since the IDR process became mandatory in January 2022, the Departments have completely ignored this statutory timeframe. Indeed, it took months *after* the IDR process  became mandatory in January 2022 for the Departments to set up and open the portal that enabled the Practice to initiate the process and submit the required documents. And then, even after the portal opened, there were months on end when the entire process ground to a halt because of successful challenges that were made to the IDR determination methodology established by the Department's regulations.[2] These decisions are *Texas Medical Association. v. United States Department of Health and Human Services*, Case No. 6:21-cv-425 (E.D. Tex. Feb. 23, 2022) (*TMA* I); *LifeNet, Inc. v. United States Department of Health and Human Services*, Case No. 6:22-cv-162 (E.D. Tex. Jul. 26, 2022) (*LifeNe*t I), and *Texas Medical Association v. United States Department of Health and Human Services*, Case No. 6:22-cv-372 (E.D. Tex. Feb. 6, 2023) (*TMA* II) .

47.     It was only on February 23, 2023 that the Departments instructed IDR entities to resume processing payment determinations (effective February 27, 2023).

48.     These delays, unfortunately, were only the tip of the iceberg. Even when the IDR process was up and running globally, the overloading of the IDR system – largely due to the number of cases submitted throughout the country, logistical issues with the portal, and the failure to have sufficient IDR entities on board to meet the demand – has meant that the time from submission of all documentation to decision has not even remotely met the statutorily required 30-day deadline.

49.     Indeed, virtually all the Practice's IDR proceedings commenced and ready for decision in 1Q and 2Q 2022 remain undecided as of today, *more than one year later*. Clearly, the Departments have not taken seriously their statutory obligation to move IDR proceedings to conclusion within the 30-day timeframe. Put simply, the Departments have utterly failed to contribute the required amounts of resources and implement the required level of oversight to comply with this statutory timeframe.

50.     Additionally, one of the biggest causes of IDR process delays is eligibility disputes, where there is an issue between the parties as to whether a particular dispute is eligible for IDR under the No Surprises Act. Unfortunately, these issues are being decided on an *ad hoc* basis with no requirement for an explanation as to the reasons for eligibility or ineligibility.

51.     As a result, the Practice, and other similarly situated out-of-network providers, are left in the dark regarding what disputes are, and are not eligible, for IDR. It also appears that plans are making blanket ineligibility claims to delay processing and increase providers' costs.

52.     For these reasons, the Departments should, consistent with the letter and spirit of the No Surprises Act, be required to provide a streamlined process for determining threshold eligibility issues, along with providing an explanation for why a dispute is eligible or ineligible for IDR so as to eliminate this roadblock in the processing system, and give the parties a better understanding of what is eligible, thereby reducing the filing of ineligible claims.

**IDR Roadblocks**

53.     Additionally, the Departments have also placed roadblocks in the IDR process that seem designed to favor the plans at the expense of out-of-network providers such as the Practice.

54.     These roadblocks include an unwillingness to allow reasonable batching of similar claims, which would make it easier and more efficient for the providers to use the IDR process, and lead to a quicker resolution of claims, as well as persistently clinging to the QPA as essentially a "benchmark" in the IDR process, notwithstanding court decisions that squarely held that such a position is contrary to the purpose and intent underlying the No Surprises Act.

55.     These unfounded decisions by the Departments – all of which favored the plans – has been a major contributor to the current severe delays. The irony is that, had the Department simply fully and fairly implemented the IDR process in accordance with Congressional intent and the plain language of the No Surprises Act, the process would currently be working efficiently and many of the delays would be eliminated. The Departments are also fully aware that IDR process delays grievously injure out-of-network providers by denying them access to reimbursements, yet they have done nothing to move the process along.

56.     This has had a direct and significantly negative effect on the Practice and other similarly situated out-of-network providers.

57.     As alleged above, health plans have delayed and lowballed initial payments to providers required by the Act, and the Act bars providers from balance billing or otherwise seeking payment from plan beneficiaries. This has made the Practice and other similarly situated out-of-

network providers entirely dependent on the timely and efficient conclusion of the IDR process to receive reimbursement for the medically necessary services that they provided plan beneficiaries.

58.     These delays in reimbursement-claim proceeding through the IDR process has had the effect of almost completely shutting down reimbursement to the Practice and other similarly situated out-of-network providers. No practice can survive long without reimbursement, particularly where, as here, its expenses not only continue but have significantly increased.

**Illegal IDR Decision Making Criteria**

59.     Unfortunately, even those cases processed through IDR are fraught with illegalities and pro-health plan biases sanctioned by the Departments. For example, the main thrust of the various court decisions invalidating and vacating various provisions of the Departments' regulations is that those regulations, and the Departments' guidance applying them, place undue, almost talismanic, emphasis on the QPA to the point where there IDR entities were interpreting the regulations to create a rebuttable presumption that the offer closest to the QPA should be adopted as the payment amount. The decisions also rejected the concept that additional non-QPA factors are of lesser importance in the IDR entities' deliberations.

60.     Yet, to this day, notwithstanding these decisions, the Departments are still issuing guidance to IDR entities, and comments on their regulations, which confuse these issues and refer IDR entities and other parties back to guidance documents that are based on the invalidated regulations. Specifically, the Departments, despite the recent losses in the federal lawsuits, have still not clarified to IDR entities that they are NOT to presume that non-QPA data are "included" or "factored in" the QPA, and, as such, they are NOT to presume that non-QPA data should receive reduced consideration or no consideration as a result.

61.     Furthermore, the Departments have still not clarified to IDR entities that medical providers are NOT required to demonstrate that non-QPA data is "not already included" in the QPA, and that non-QPA data must be given full consideration regardless of any such demonstration by medical providers. As such, IDR entities are still making rulings with exactly such faulty reasoning against doctors, that is, that other data was already "included" in the QPA, and that such data was not given weighting and consideration because doctors hadn't "demonstrated" that such data wasn't already, somehow, "included" in the QPA.

62.     These actions by the Departments favor the health plans to the extreme detriment of the Practice and other similarly situated out-of-network providers because they place undue importance on the QPA, the setting of which is entirely in the control of the health plans. These misplaced and improper guidance documents have resulted in many pro-health plan IDR decisions that blatantly misapply the appropriate criteria as set forth in the No Surprises Act.

**Ping Ponging Between NY and NSA IDR Processes**

63.     The No Surprises Act's IDR process does not apply when a state has a specified state law that meets certain criteria regarding the provision of an alternative IDR process. 42 U.S.C. §§ 300gg-111(a)(3)(H)(i), 300gg-111(a)(3)(I).

64.     New York's specified state law is New York Surprise Bill and Emergency Medical Services Law, codified at article 6 of the New York Financial Services Law. It applies primarily to fully insured health plans in New York where the care underlying the dispute is rendered under circumstances that would meet the definition of a surprise bill or emergency medical services. *See* N.Y. Financial Services Law §§ 601-08. Disputes involving surprise bills and emergency

medical services are submitted to a New York IDR process overseen by the New York Department of Financial Services.

65.     The New York Department of Financial Services has consistently taken the position that elective procedures, performed in a hospital, by an out-of-network provider, on a fully insured health plan beneficiary, who was aware before he or she came to the hospital that the provider was out-of-network, but chose to proceed anyway, do not fall within the definition of a surprise bill or emergency medical services under article 6 of the Financial Services Law and, accordingly, are not eligible for New York IDR. Accordingly, under the No Surprises Act, those disputes are therefore subject to federal IDR because there is not a specified state law that applies. 42 U.S.C. §§ 300gg-111(a)(3)(H)(i), 300gg-111(a)(3)(I).

66.     However, recently, when the Practice and other similarly situated out-of-network providers have taken these cases to federal IDR, the fully insured health plans, supported by the New York Department of Financial Services, have taken the position that these claims are ineligible for federal IDR under the No Surprises Act because a specified state law applies. Notwithstanding that this is an incorrect interpretation of the law, the federal IDR entities, aided by the Departments, have accepted the plans' arguments, and refused to process these claims through federal IDR.

67.     When the Practice and other similarly situated out-of-network providers attempt to submit these cases to New York IDR, the very same plans, again aided by the New York Department of Financial Services, have taken the infuriatingly inconsistent position that these claims are not eligible for New York IDR because, under New York law, they are neither surprise bills nor emergency medical services claims. Thus, the Practice and other similarly situated out-of-network

providers, through the inaction of the Departments, have been left without any avenue to challenge the abysmally low reimbursement provided in the first instance by the plans.

**Refusal to Honor Additional Payment Obligations**

68.     Additionally, even in cases where the IDR process has come to decision – long after the required 30-day timeframe – the Practice and other similarly situated out-of-network providers still have not received their reimbursement.

69.     For example, under the Act, when the IDR entity has decided the IDR dispute by selecting the Practice's offer, the plans have 30 days from the date on which the IDR entity makes its determination to pay the additional reimbursement due the Practice. Specifically, 42 U.S.C. § 300gg-111(c)(6) provides:

> The total plan or coverage payment required pursuant to subsection (a)(1) or (b)(1), with respect to a qualified IDR item or service for which a determination is made under paragraph (5)(A) or with respect to an item or service for which a payment amount is determined under open negotiations under paragraph (1), shall be made directly to the nonparticipating provider or facility not later than 30 days after the date on which such determination is made.

42 U.S.C. § 300gg-111(c)(6).

70.     There have been numerous claims involving medical services provided by the Practice to enrollees of the plans for which (a) an IDR proceeding was commenced; (b) the duly appointed IDR entity, after reviewing the parties' offers and submissions, selected the Practice's offers, resulting in an additional reimbursement due from the plans to the Practice; (c) more than 30 days have elapsed since the IDR entity made these determinations; yet (d) the plans have breached their statutory obligation under 42 U.S.C. § 300gg-111(c)(6) to pay these additional reimbursement amounts.

71.     Making matters worse, the plans have persisted in failing to pay these additional, statutorily ordered reimbursement amounts notwithstanding numerous attempts by the Practice to have the plans honor their obligations.(And, in many cases, they have attempted to satisfy their obligations by sending the additional reimbursement to the patient/beneficiaries.)

72.     These failures have been brought to the attention of the Departments, but nothing has been done to redress these statutory violations.

**Irreparable Harm Suffered by the Practice and the Public At Large**

73.     By reason of all the foregoing, the Practice, and other similarly situated out-of-network providers, have been grievously and irreparably harmed.

74.     As alleged above, under the No Surprises Act, out-of-network providers are forbidden from balance billing patients after providing those patients with medically necessary health care services. Relatedly, the No Surprises Act allows health plans to unilaterally determine the amount of reimbursement they pay in the first instance to those providers for the medically necessary health care services that the providers render to the plans' members.  Abusing this unilateral power, many health plans are initially reimbursing the Practice, and other similarly situated out-of-network providers, at minimal rates far below what these providers received before the effective date of the No Surprises Act. These reimbursement rates are also significantly below the providers' costs of delivering the medically services, as well as far below the  usual, customary, and reasonable rates for the services established by the industry standard benchmarking services.

75.     Given these circumstances, the Practice, and other similarly situated out-of-network providers, are heavily dependent upon the effectiveness, timeliness, and efficiency of the

federal IDR process established by the No Surprises Act to "level the playing field" with the plans, and ensure that the providers receive if not reasonable compensation for their services, at least compensation for their services that covers the costs for providing those services.

76.      Unfortunately, as outlined above, the Departments have failed to honor their statutory obligations under the No Surprises Act and have thereby destroyed the timeliness, effectiveness, and efficiency of the federal IDR process. As a consequence, the Practice, and other similarly situated out-of-network providers, have been forced to wait now for more than a year to receive anything but minimal, far-below-cost reimbursement for the medically necessary services that they provided.  The inefficiencies of the federal IDR process – created by the Departments' inactions and actions outlined above – have also greatly increased the providers' revenue cycle costs, at a time when reimbursements have been drastically cut.

77.      As a result of the foregoing, the Practice, and other similarly situated out-of-network providers, have suffered significant and irreparable injury. They have been forced to confront a situation where, as a result of the Departments' actions, their reimbursements have been drastically reduced and delayed, at the same time that their costs for providing their medically necessary services have significantly risen.

78.      No business – much less an independent medical practice in one of the most expensive regions of the country – can long sustain such financial difficulties. The Practice, and other similarly situated out-of-network providers, accordingly, have been forced to curtail and, in many cases, eliminate services, reduce the acquisition of new equipment, and hold off hiring additional or replacement clinicians and support personnel.

79.     Some out-of-network providers have already gone out of business. If the current situation regarding the timeliness, effectiveness, and efficiency of the federal IDR process is allowed to continue, many more providers will have their businesses and livelihoods destroyed due to the Departments' actions and inactions, as outlined above.

80.     In addition to damaging the providers, this will have the far greater impact of reducing the availability of high-quality and timely medically necessary health care services for the public.

81.     There is no adequate remedy at law for these irreparable injuries.

## FIRST CAUSE OF ACTION

82.     Plaintiff repeats and re-alleges the allegations set forth above as if more fully set forth herein.

83.     When implementing and administering the No Surprises Act, and particularly the federal IDR process established by the Act, the Departments are subject to the express provisions of the Act as well as the requirements of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 1 *et seq.*

84.     Pursuant to the provisions of the No Surprises Act and the requirements of the APA, the Departments are prohibited from:

a.     Unlawfully withholding or unreasonably delaying agency action, 5 U.S.C. § 706(1).

b.     Acting arbitrarily, capriciously, in abuse of discretion, or otherwise not in accordance with law, *id.* § 706(2)(A).

  c.  Acting contrary to constitutional right, power, privilege, or immunity, *id.* § 706(2)(B).

  d.  Acting in excess of statutory jurisdiction, or limitations, *id.* § 706(2)(C).

  e.  Acting without observance of procedure required by law, *id.* § 706(2)(D).

85.  Additionally, pursuant to the provisions of the No Surprises Act and the requirements of the APA, the Departments. "[w]ith due regard for the convenience and necessity of the parties or their representatives and within a reasonable time," are obligated to "proceed to conclude a matter presented to it." 5 U.S.C. § 555(b).

86.  By reason of all the foregoing, and as specifically alleged in detail above, the Departments have violated these obligations under the No Surprises Act and the APA by undertaking a series of inappropriate and illegal actions and inactions including, but not limited to, the following:

  a.  Failing to compel health plans subject to the No Surprises Act to either make an initial payment to the provider or issue of notice of denial of payment within 30 calendar days after the out-of-network provider transmits its bill to the health plan. *See* 42 U.S.C. §§ 300gg-111(a)(1)(C)(iv) (emergency services), 300gg-111(b)(1)(C) (non-emergency services).

  b.  Failing to adopt procedures to monitor health plans' compliance with their obligations under the No Surprises Act to either make an initial payment to the provider or issue of notice of denial of payment within 30 calendar days after the out-of-network provider transmits its bill to the health plan. *See id.*

  c.  Failing to compel health plans subject to the No Surprises Act to make initial payments to the out-of-network providers who rendered the medically necessary services, as opposed to the patients. *See id.*

  d.  Failing to adopt procedures to monitor health plans' compliance with their obligation under the No Surprises Act to make initial payments to the out-of-network providers who rendered the medically necessary services, as opposed to the patients. *See id.*

e. Failing to require health plans to clearly state on their explanation of benefit (EOB) forms their understanding of whether the case is IDR eligible and in which venue (federal or state).

f. Failing to require health plans to present an exact value of their QPA in the EOB.

g. Failing to require that health plans engage in meaningful open negotiations with out-of-network providers regarding reimbursement rates, as required by 42 U.S.C. § 300gg-111(c)(1)(A).

h. Failing to follow and observe the tight time frames established by the No Surprises Act for the IDR process. *See* 42 U.S.C. § 300gg-111(c)(5)(A).

i. Failing to establish a streamlined process for determining threshold eligibility issues, along with providing an explanation for why a dispute is eligible or ineligible for IDR so as to eliminate roadblocks in the IDR processing system.

j. Failing to allow a reasonable batching of similarly situated IDR claims.

k. Failing to follow the provisions of the No Surprises Act and require that reimbursement disputes relating to elective procedures performed in a New York state-located hospital, by an out-of-network provider, on a fully insured health plan beneficiary, who was aware before he or she came to the hospital that the provider was out of network, but chose to proceed anyway, be accepted by and decided through federal IDR process. 42 U.S.C. §§ 300gg-111(a)(3)(H)(i), 300gg-111(a)(3)(I), New York Financial Services Law §§ 601-08.

l. Failing to require health plans to pay additional reimbursement due providers, as determined through the IDR process, within 30 days, as required by the No Surprises Act. *See* 42 U.S.C. § 300gg-111(c)(6).

m. Failing to adopt procedures to monitor health plans' compliance with their obligations to require health plans to pay additional reimbursement due providers, as determined through the IDR process, within 30 days, as required by the No Surprises Act. *See id*.

87. By reason of all the foregoing, the Practice is entitled to a judgment under the Declaratory Judgment Act, 38 U.S.C. §§ 2201-02, declaring that the Departments have violated these obligations under the No Surprises Act and the APA by undertaking a series of inappropriate and illegal actions and inactions including, but not limited to, the following:

a.      Failing to compel health plans subject to the No Surprises Act to either make an initial payment to the provider or issue of notice of denial of payment within 30 calendar days after the out-of-network provider transmits its bill to the health plan. *See* 42 U.S.C. §§ 300gg-111(a)(1)(C)(iv) (emergency services), 300gg-111(b)(1)(C) (non-emergency services).

b.      Failing to adopt procedures to monitor health plans' compliance with their obligations under the No Surprises Act to either make an initial payment to the provider or issue of notice of denial of payment within 30 calendar days after the out-of-network provider transmits its bill to the health plan. *See id.*

c.      Failing to compel health plans subject to the No Surprises Act to make initial payments to the out-of-network providers who rendered the medically necessary services, as opposed to the patients. *See id.*

d.      Failing to adopt procedures to monitor health plans' compliance with their obligation under the No Surprises Act to make initial payments to the out-of-network providers who rendered the medically necessary services, as opposed to the patients. *See id.*

e.      Failing to require health plans to clearly state on their explanation of benefit (EOB) forms their understanding of whether the case is IDR eligible and in which venue (federal or state).

f.      Failing to require health plans to present an exact value of their QPA in the EOB.

g.      Failing to require that health plans engage in meaningful open negotiations with out-of-network providers regarding reimbursement rates, as required by 42 U.S.C. § 300gg-111(c)(1)(A).

h.      Failing to follow and observe the tight time frames established by the No Surprises Act for the IDR process. *See* 42 U.S.C. § 300gg-111(c)(5)(A).

i.      Failing to establish a streamlined process for determining threshold eligibility issues, along with providing an explanation for why a dispute is eligible or ineligible for IDR so as to eliminate roadblocks in the IDR processing system.

j.      Failing to allow a reasonable batching of similarly situated IDR claims.

k.      Failing to follow the provisions of the No Surprises Act and require that reimbursement disputes relating to elective procedures performed in a New York state-located hospital, by an out-of-network provider, on a fully insured health plan beneficiary, who was aware before he or she came to the hospital that the provider was out of network, but chose to

proceed anyway, be accepted by and decided through federal IDR process. 42 U.S.C. §§ 300gg-111(a)(3)(H)(i), 300gg-111(a)(3)(I), New York Financial Services Law §§ 601-08.

l.   Failing to require health plans to pay additional reimbursement due providers, as determined through the IDR process, within 30 days, as required by the No Surprises Act.  *See* 42 U.S.C. § 300gg-111(c)(6).

m.   Failing to adopt procedures to monitor health plans' compliance with their obligations to require health plans to pay additional reimbursement due providers, as determined through the IDR process, within 30 days, as required by the No Surprises Act.  *See id.*

88.   By reason of the all the foregoing, the Practice is entitled to an order under 5 U.S.C. § 706 directing that the Departments:

a.   Compel health plans subject to the No Surprises Act to either make an initial payment to the provider or issue of notice of denial of payment within 30 calendar days after the out-of-network provider transmits its bill to the health plan.  *See* 42 U.S.C. §§ 300gg-111(a)(1)(C)(iv) (emergency services), 300gg-111(b)(1)(C) (non-emergency services).

b.   Adopt procedures to monitor health plans' compliance with their obligations under the No Surprises Act to either make an initial payment to the provider or issue of notice of denial of payment within 30 calendar days after the out-of-network provider transmits its bill to the health plan.  *See id.*

c.   Compel health plans subject to the No Surprises Act to make initial payments to the out-of-network providers who rendered the medically necessary services, as opposed to the patients. *See id.*

d.   Adopt procedures to monitor health plans' compliance with their obligation under the No Surprises Act to make initial payments to the out-of-network providers who rendered the medically necessary services, as opposed to the patients. *See id.*

e.   Require health plans to clearly state on their explanation of benefit (EOB) forms their understanding of whether the case is IDR eligible and in which venue (federal or state).

f.   Require health plans to present an exact value of their QPA in the EOBs.

g.   Require that health plans engage in meaningful open negotiations with out-of-network providers regarding reimbursement rates, as required by 42 U.S.C. § 300gg-111(c)(1)(A).

h.    Follow and observe the tight time frames established by the No Surprises Act for the IDR process. *See* 42 U.S.C. § 300gg-111(c)(5)(A).

i.    Establish a streamlined process for determining threshold eligibility issues, along with providing an explanation for why a dispute is eligible or ineligible for IDR so as to eliminate roadblocks in the IDR processing system.

j.    Allow a reasonable batching of similarly situated IDR claims.

k.    Follow the provisions of the No Surprises Act and require that reimbursement disputes relating to elective procedures performed in a New York state-located hospital, by an out-of-network provider, on a fully insured health plan beneficiary, who was aware before he or she came to the hospital that the provider was out of network, but chose to proceed anyway, be accepted by and decided through federal IDR process. 42 U.S.C. §§ 300gg-111(a)(3)(H)(i), 300gg-111(a)(3)(I), New York Financial Services Law §§ 601-08.

l.    Require health plans to pay additional reimbursement due providers, as determined through the IDR process, within 30 days, as required by the No Surprises Act. *See* 42 U.S.C. § 300gg-111(c)(6).

m.    Adopt procedures to monitor health plans' compliance with their obligations to require health plans to pay additional reimbursement due providers, as determined through the IDR process, within 30 days, as required by the No Surprises Act. *See id.*

89.    By reason of all the foregoing, awarding such other and further relief under the No Surprises Act and the APA that the Court deems just, proper, and equitable.

## SECOND CAUSE OF ACTION

90.    Plaintiff repeats and re-alleges the allegations set forth above as if more fully set forth herein.

91.    By reason of all the foregoing, and as specifically alleged in detail above, the Departments have violated their obligations under the No Surprises Act and the APA by undertaking a series of inappropriate and illegal actions and inactions including, but not limited to, the following:

27

a.   Failing to compel health plans subject to the No Surprises Act to either make an initial payment to the provider or issue of notice of denial of payment within 30 calendar days after the out-of-network provider transmits its bill to the health plan. *See* 42 U.S.C. §§ 300gg-111(a)(1)(C)(iv) (emergency services), 300gg-111(b)(1)(C) (non-emergency services).

b.   Failing to adopt procedures to monitor health plans' compliance with their obligations under the No Surprises Act to either make an initial payment to the provider or issue of notice of denial of payment within 30 calendar days after the out-of-network provider transmits its bill to the health plan. *See id.*

c.   Failing to compel health plans subject to the No Surprises Act to make initial payments to the out-of-network providers who rendered the medically necessary services, as opposed to the patients. *See id.*

d.   Failing to adopt procedures to monitor health plans' compliance with their obligation under the No Surprises Act to make initial payments to the out-of-network providers who rendered the medically necessary services, as opposed to the patients. *See id.*

e.   Failing to require health plans to clearly state on their explanation of benefit (EOB) forms their understanding of whether the case is IDR eligible and in which venue (federal or state).

f.   Failing to require health plans to present an exact value of their QPA in the EOB.

g.   Failing to require that health plans engage in meaningful open negotiations with out-of-network providers regarding reimbursement rates, as required by 42 U.S.C. § 300gg-111(c)(1)(A).

h.   Failing to follow and observe the tight time frames established by the No Surprises Act for the IDR process. *See* 42 U.S.C. § 300gg-111(c)(5)(A).

i.   Failing to establish a streamlined process for determining threshold eligibility issues, along with providing an explanation for why a dispute is eligible or ineligible for IDR so as to eliminate roadblocks in the IDR processing system.

j.   Failing to allow a reasonable batching of similarly situated IDR claims.

k.   Failing to follow the provisions of the No Surprises Act and require that reimbursement disputes relating to elective procedures performed in a New York state-located hospital, by an out-of-network provider, on a fully insured health plan beneficiary, who was aware before he or she came to the hospital that the provider was out of network, but chose to

proceed anyway, be accepted by and decided through federal IDR process. 42 U.S.C. §§ 300gg-111(a)(3)(H)(i), 300gg-111(a)(3)(I), New York Financial Services Law §§ 601-08.

l.    Failing to require health plans to pay additional reimbursement due providers, as determined through the IDR process, within 30 days, as required by the No Surprises Act. *See* 42 U.S.C. § 300gg-111(c)(6).

m.    Failing to adopt procedures to monitor health plans' compliance with their obligations to require health plans to pay additional reimbursement due providers, as determined through the IDR process, within 30 days, as required by the No Surprises Act. *See id*.

92.    These actions, as alleged above, have significantly, grievously, and irreparably harmed the Practice.

93.    The Practice has no adequate remedy at law.

94.    The Departments have no defense or explanation for their illegal, unauthorized, and *ultra vires* actions and inactions outlined above.

95.    By reason of the foregoing, the Practice is entitled to a writ of prohibition or mandamus, as appropriate, under the All-Writs Act, 28 U.S.C. § 1651(a), directing that the Departments:

a.    Compel health plans subject to the No Surprises Act to either make an initial payment to the provider or issue of notice of denial of payment within 30 calendar days after the out-of-network provider transmits its bill to the health plan. *See* 42 U.S.C. §§ 300gg-111(a)(1)(C)(iv) (emergency services), 300gg-111(b)(1)(C) (non-emergency services).

b.    Adopt procedures to monitor health plans' compliance with their obligations under the No Surprises Act to either make an initial payment to the provider or issue of notice of denial of payment within 30 calendar days after the out-of-network provider transmits its bill to the health plan. *See id*.

c.    Compel health plans subject to the No Surprises Act to make initial payments to the out-of-network providers who rendered the medically necessary services, as opposed to the patients. *See id*.

d.      Adopt procedures to monitor health plans' compliance with their obligation under the No Surprises Act to make initial payments to the out-of-network providers who rendered the medically necessary services, as opposed to the patients. *See id.*

e.      Require health plans to clearly state on their explanation of benefit (EOB) forms their understanding of whether the case is IDR eligible and in which venue (federal or state).

f.      Require health plans to present an exact value of their QPA in the EOBs.

g.      Require that health plans engage in meaningful open negotiations with out-of-network providers regarding reimbursement rates, as required by 42 U.S.C. § 300gg-111(c)(1)(A).

h.      Follow and observe the tight time frames established by the No Surprises Act for the IDR process. *See* 42 U.S.C. § 300gg-111(c)(5)(A).

i.      Establish a streamlined process for determining threshold eligibility issues, along with providing an explanation for why a dispute is eligible or ineligible for IDR so as to eliminate roadblocks in the IDR processing system.

j.      Allow a reasonable batching of similarly situated IDR claims.

k.      Follow the provisions of the No Surprises Act and require that reimbursement disputes relating to elective procedures performed in a New York state-located hospital, by an out-of-network provider, on a fully insured health plan beneficiary, who was aware before he or she came to the hospital that the provider was out of network, but chose to proceed anyway, be accepted by and decided through federal IDR process. 42 U.S.C. §§ 300gg-111(a)(3)(H)(i), 300gg-111(a)(3)(I), New York Financial Services Law §§ 601-08.

l.      Require health plans to pay additional reimbursement due providers, as determined through the IDR process, within 30 days, as required by the No Surprises Act. *See* 42 U.S.C. § 300gg-111(c)(6).

m.      Adopt procedures to monitor health plans' compliance with their obligations to require health plans to pay additional reimbursement due providers, as determined through the IDR process, within 30 days, as required by the No Surprises Act. *See id.*

96.      By reason of all the foregoing, awarding such other and further relief that the Court deems just, proper, and equitable.

**THIRD CAUSE OF ACTION**

97.     Plaintiff repeats and re-alleges the allegations set forth above as if more fully set forth herein.

98.     The Fifth Amendment to the United States Constitution protect citizens, including the Practice, from, among other things, being deprived of property rights without due process of law.

99.     Out-of-network physicians, including the Practice, have a recognized legal and enforceable property right to be compensated for the medically necessary services that they provide patients.

100.    Out-of-network physicians, including the Practice, typically have two sources for this compensatory reimbursement. One source is to obtain payment directly from the patient who received and benefitted from the services. The other source is to obtain payment from the health plan or other third-party payer obligated to provide health coverage for the services rendered.

101.    As alleged above, for services and situations covered by the No Surprises Act, out-of-network physicians, including the Practice, *are prohibited* from seeking or receiving reimbursement from the patient in  many circumstances. *See* 42 U.S.C. §§ 300gg-131(a) (emergency services), 300gg-132 (non-emergency services performed by nonparticipating providers at participating facilities). Their only recourse, accordingly, is to seek or receive reimbursement from the applicable health plan.

102.     While out-of-network physicians under the No Surprises Act can seek payment from these health plans, the Act provides that the plans, in the first instance, make the unilateral determination whether to pay or deny the claim and, if the plan decides to pay the claim, the amount to pay.

103.     The only remedy that the Practice, and other similarly situated out-of-network providers have to challenge denials or reimbursement amounts is to use the No Surprises Act's IDR process.

104.     This remedy has become particularly important, as alleged above, because the plans (a) have routinely failed to honor the 30-day requirement to pay or issue a denial; (b) are denying claims at a significant rate; and (c) when they do pay, are paying at minimal rates far below the providers' costs, far below traditional reimbursement amounts, and far below the usual, customary, and reasonable rates established by industry standard benchmarking rates.

105.     This non-existent, delayed, or abysmally low reimbursement for medically necessary health care services that the Practice and other similarly situated out-of-network providers are experiencing constitute a deprivation of their enforceable property rights in compensation for their services.

106.     By reason of the foregoing, accordingly, a timely, effective, and efficient IDR process is essential to protect these property rights and to provide a remedy for the deprivation of these property rights.

107.     However, as alleged above, the Departments have taken a series of actions and inactions that has rendered the IDR process untimely, ineffective, and inefficient.

108.    These actions and inactions include, but are not limited to, the following:

a.      Failing to compel health plans subject to the No Surprises Act to either make an initial payment to the provider or issue of notice of denial of payment within 30 calendar days after the out-of-network provider transmits its bill to the health plan. *See* 42 U.S.C. §§ 300gg-111(a)(1)(C)(iv) (emergency services), 300gg-111(b)(1)(C) (non-emergency services).

b.      Failing to adopt procedures to monitor health plans' compliance with their obligations under the No Surprises Act to either make an initial payment to the provider or issue of notice of denial of payment within 30 calendar days after the out-of-network provider transmits its bill to the health plan. *See id.*

c.      Failing to compel health plans subject to the No Surprises Act to make initial payments to the out-of-network providers who rendered the medically necessary services, as opposed to the patients. *See id.*

d.      Failing to adopt procedures to monitor health plans' compliance with their obligation under the No Surprises Act to make initial payments to the out-of-network providers who rendered the medically necessary services, as opposed to the patients. *See id.*

e.      Failing to require health plans to clearly state on their explanation of benefit (EOB) forms their understanding of whether the case is IDR eligible and in which venue (federal or state).

f.      Failing to require health plans to present an exact value of their QPA in the EOB.

g.      Failing to require that health plans engage in meaningful open negotiations with out-of-network providers regarding reimbursement rates, as required by 42 U.S.C. § 300gg-111(c)(1)(A).

h.      Failing to follow and observe the tight time frames established by the No Surprises Act for the IDR process. *See* 42 U.S.C. § 300gg-111(c)(5)(A).

i.      Failing to establish a streamlined process for determining threshold eligibility issues, along with providing an explanation for why a dispute is eligible or ineligible for IDR so as to eliminate roadblocks in the IDR processing system.

j.      Failing to allow a reasonable batching of similarly situated IDR claims.

k.      Failing to follow the provisions of the No Surprises Act and require that reimbursement disputes relating to elective procedures performed in a

New York state-located hospital, by an out-of-network provider, on a fully insured health plan beneficiary, who was aware before he or she came to the hospital that the provider was out of network, but chose to proceed anyway, be accepted by and decided through federal IDR process. 42 U.S.C. §§ 300gg-111(a)(3)(H)(i), 300gg-111(a)(3)(I), New York Financial Services Law §§ 601-08.

l.      Failing to require health plans to pay additional reimbursement due providers, as determined through the IDR process, within 30 days, as required by the No Surprises Act. *See* 42 U.S.C. § 300gg-111(c)(6).

m.     Failing to adopt procedures to monitor health plans' compliance with their obligations to require health plans to pay additional reimbursement due providers, as determined through the IDR process, within 30 days, as required by the No Surprises Act. *See id.*

109.    As a result of all the foregoing, the Departments' actions and inactions have deprived the Practice, and other similarly situated out-of-network providers, of their property without due process of law.

110.    The Practice has no adequate remedy at law.

111.    By reason of all the foregoing, the Practice is entitled to a judgment under the Declaratory Judgment Act, 38 U.S.C. §§ 2201-02, declaring that the Departments have deprived the Practice, and other similarly situated out-of-network providers, of their property without due process of law  in violation of the Fifth Amendment of the United States Constitution.

112.    By reason of all the foregoing, the Practice is entitled to a permanent injunction directing that the Departments:

a.      Compel health plans subject to the No Surprises Act to either make an initial payment to the provider or issue of notice of denial of payment within 30 calendar days after the out-of-network provider transmits its bill to the health plan. *See* 42 U.S.C. §§ 300gg-111(a)(1)(C)(iv) (emergency services), 300gg-111(b)(1)(C) (non-emergency services).

b.      Adopt procedures to monitor health plans' compliance with their obligations under the No Surprises Act to either make an initial payment

to the provider or issue of notice of denial of payment within 30 calendar days after the out-of-network provider transmits its bill to the health plan. *See id.*

c.      Compel health plans subject to the No Surprises Act to make initial payments to the out-of-network providers who rendered the medically necessary services, as opposed to the patients. *See id.*

d.      Adopt procedures to monitor health plans' compliance with their obligation under the No Surprises Act to make initial payments to the out-of-network providers who rendered the medically necessary services, as opposed to the patients. *See id.*

e.      Require health plans to clearly state on their explanation of benefit (EOB) forms their understanding of whether the case is IDR eligible and in which venue (federal or state).

f.      Require health plans to present an exact value of their QPA in the EOBs.

g.      Require that health plans engage in meaningful open negotiations with out-of-network providers regarding reimbursement rates, as required by 42 U.S.C. § 300gg-111(c)(1)(A).

h.      Follow and observe the tight time frames established by the No Surprises Act for the IDR process. *See* 42 U.S.C. § 300gg-111(c)(5)(A).

i.      Establish a streamlined process for determining threshold eligibility issues, along with providing an explanation for why a dispute is eligible or ineligible for IDR so as to eliminate roadblocks in the IDR processing system.

j.      Allow a reasonable batching of similarly situated IDR claims.

k.      Follow the provisions of the No Surprises Act and require that reimbursement disputes relating to elective procedures performed in a New York state-located hospital, by an out-of-network provider, on a fully insured health plan beneficiary, who was aware before he or she came to the hospital that the provider was out of network, but chose to proceed anyway, be accepted by and decided through federal IDR process. 42 U.S.C. §§ 300gg-111(a)(3)(H)(i), 300gg-111(a)(3)(I), New York Financial Services Law §§ 601-08.

l.      Require health plans to pay additional reimbursement due providers, as determined through the IDR process, within 30 days, as required by the No Surprises Act. *See* 42 U.S.C. § 300gg-111(c)(6).

m.      Adopt procedures to monitor health plans' compliance with their obligations to require health plans to pay additional reimbursement due

providers, as determined through the IDR process, within 30 days, as required by the No Surprises Act. *See id*.

113.     By reason of all the foregoing, awarding such other and further relief that the Court deems just, proper, and equitable.

## FOURTH CAUSE OF ACTION

114.     Plaintiff repeats and re-alleges the allegations set forth above as if more fully set forth herein.

115.     The Fifth Amendment to the United States Constitution protects citizens, including the Practice, from the taking of their private property without just compensation.

116.     Out-of-network physicians, including the Practice, have a recognized legal and enforceable property right to be compensated for the medically necessary services that they provide patients.

117.     Out-of-network physicians, including the Practice, typically have two sources for this compensatory reimbursement. One source is to obtain payment directly from the patient who received and benefitted from the services. The other source is to obtain payment from the health plan or other third-party payer obligated to provide health coverage for the services rendered.

118.     As alleged above, for services and situations covered by the No Surprises Act, out-of-network physicians, including the Practice, *are prohibited* from seeking or receiving reimbursement from the patient in  many circumstances. *See* 42 U.S.C. §§ 300gg-131(a) (emergency services), 300gg-132 (non-emergency services performed by nonparticipating

providers at participating facilities). Their only recourse, accordingly, is to seek or receive reimbursement from the applicable health plan.

119.     While out-of-network physicians under the No Surprises Act can seek payment from these health plans, the Act provides that the plans, in the first instance, make the unilateral determination whether to pay or deny the claim and, if the plan decides to pay the claim, the amount to pay.

120.     The only remedy that the Practice, and other similarly situated out-of-network providers have to challenge denials or reimbursement amounts is to use the No Surprises Act's IDR process.

121.     This remedy has become particularly important, as alleged above, because the plans (a) have routinely failed to honor the 30-day requirement to pay or issue a denial; (b) are denying claims at a significant rate; and (c) when they do pay, are paying at  minimal rates far below the providers' costs, far below traditional reimbursement amounts, and far below the usual, customary, and reasonable rates established by industry standard benchmarking rates.

122.     This non-existent, delayed, or abysmally low reimbursement for medically necessary health care services that the Practice and other similarly situated out-of-network providers are experiencing constitute a taking of their property.

123.     By reason of the foregoing, accordingly, a timely, effective, and efficient IDR process is essential to ensure that the providers receive just compensation for the taking of this property.

124.     However, as alleged above, the Departments have taken a series of actions and inactions that has rendered the IDR process untimely, ineffective, and inefficient.

125.     These actions and inactions include, but are not limited to, the following:

a.     Failing to compel health plans subject to the No Surprises Act to either make an initial payment to the provider or issue of notice of denial of payment within 30 calendar days after the out-of-network provider transmits its bill to the health plan. *See* 42 U.S.C. §§ 300gg-111(a)(1)(C)(iv) (emergency services), 300gg-111(b)(1)(C) (non-emergency services).

b.     Failing to adopt procedures to monitor health plans' compliance with their obligations under the No Surprises Act to either make an initial payment to the provider or issue of notice of denial of payment within 30 calendar days after the out-of-network provider transmits its bill to the health plan. *See id.*

c.     Failing to compel health plans subject to the No Surprises Act to make initial payments to the out-of-network providers who rendered the medically necessary services, as opposed to the patients. *See id.*

d.     Failing to adopt procedures to monitor health plans' compliance with their obligation under the No Surprises Act to make initial payments to the out-of-network providers who rendered the medically necessary services, as opposed to the patients. *See id.*

e.     Failing to require health plans to clearly state on their explanation of benefit (EOB) forms their understanding of whether the case is IDR eligible and in which venue (federal or state).

f.     Failing to require health plans to present an exact value of their QPA in the EOB.

g.     Failing to require that health plans engage in meaningful open negotiations with out-of-network providers regarding reimbursement rates, as required by 42 U.S.C. § 300gg-111(c)(1)(A).

h.     Failing to follow and observe the tight time frames established by the No Surprises Act for the IDR process. *See* 42 U.S.C. § 300gg-111(c)(5)(A).

i.     Failing to establish a streamlined process for determining threshold eligibility issues, along with providing an explanation for why a dispute is eligible or ineligible for IDR so as to eliminate roadblocks in the IDR processing system.

<ol type="a" start="10">
<li>j.    Failing to allow a reasonable batching of similarly situated IDR claims.</li>

<li>k.    Failing to follow the provisions of the No Surprises Act and require that reimbursement disputes relating to elective procedures performed in a New York state-located hospital, by an out-of-network provider, on a fully insured health plan beneficiary, who was aware before he or she came to the hospital that the provider was out of network, but chose to proceed anyway, be accepted by and decided through federal IDR process. 42 U.S.C. §§ 300gg-111(a)(3)(H)(i), 300gg-111(a)(3)(I), New York Financial Services Law §§ 601-08.</li>

<li>l.    Failing to require health plans to pay additional reimbursement due providers, as determined through the IDR process, within 30 days, as required by the No Surprises Act. *See* 42 U.S.C. § 300gg-111(c)(6).</li>

<li>m.    Failing to adopt procedures to monitor health plans' compliance with their obligations to require health plans to pay additional reimbursement due providers, as determined through the IDR process, within 30 days, as required by the No Surprises Act. *See id*.</li>
</ol>

126.    As a result of all the foregoing, the Departments' actions and inactions have denied the Practice, and other similarly situated out-of-network providers, of just compensation for the taking of their property.

127.    The Practice has no adequate remedy at law.

128.    By reason of the foregoing, the Practice is entitled to a judgment under the Declaratory Judgment Act, 38 U.S.C. §§ 2201-02, declaring that the Departments have taken the private property of the Practice, and other similarly situated out-of-network providers, without just compensation in violation of the Fifth Amendment of the United States Constitution.

129.    By reason of all the foregoing, the Practice is entitled to a permanent injunction directing that the Departments:

<ol type="a">
<li>a.    Compel health plans subject to the No Surprises Act to either make an initial payment to the provider or issue of notice of denial of payment within 30 calendar days after the out-of-network provider transmits its</li>
</ol>

bill to the health plan. *See* 42 U.S.C. §§ 300gg-111(a)(1)(C)(iv) (emergency services), 300gg-111(b)(1)(C) (non-emergency services).

b.    Adopt procedures to monitor health plans' compliance with their obligations under the No Surprises Act to either make an initial payment to the provider or issue of notice of denial of payment within 30 calendar days after the out-of-network provider transmits its bill to the health plan. *See id.*

c.    Compel health plans subject to the No Surprises Act to make initial payments to the out-of-network providers who rendered the medically necessary services, as opposed to the patients. *See id.*

d.    Adopt procedures to monitor health plans' compliance with their obligation under the No Surprises Act to make initial payments to the out-of-network providers who rendered the medically necessary services, as opposed to the patients. *See id.*

e.    Require health plans to clearly state on their explanation of benefit (EOB) forms their understanding of whether the case is IDR eligible and in which venue (federal or state).

f.    Require health plans to present an exact value of their QPA in the EOBs.

g.    Require that health plans engage in meaningful open negotiations with out-of-network providers regarding reimbursement rates, as required by 42 U.S.C. § 300gg-111(c)(1)(A).

h.    Follow and observe the tight time frames established by the No Surprises Act for the IDR process. *See* 42 U.S.C. § 300gg-111(c)(5)(A).

i.    Establish a streamlined process for determining threshold eligibility issues, along with providing an explanation for why a dispute is eligible or ineligible for IDR so as to eliminate roadblocks in the IDR processing system.

j.    Allow a reasonable batching of similarly situated IDR claims.

k.    Follow the provisions of the No Surprises Act and require that reimbursement disputes relating to elective procedures performed in a New York state-located hospital, by an out-of-network provider, on a fully insured health plan beneficiary, who was aware before he or she came to the hospital that the provider was out of network, but chose to proceed anyway, be accepted by and decided through federal IDR process. 42 U.S.C. §§ 300gg-111(a)(3)(H)(i), 300gg-111(a)(3)(I), New York Financial Services Law §§ 601-08.

l.       Require health plans to pay additional reimbursement due providers, as determined through the IDR process, within 30 days, as required by the No Surprises Act. *See* 42 U.S.C. § 300gg-111(c)(6).

m.      Adopt procedures to monitor health plans' compliance with their obligations to require health plans to pay additional reimbursement due providers, as determined through the IDR process, within 30 days, as required by the No Surprises Act. *See id*.

130.      By reason of all the foregoing, awarding such other and further relief that the Court deems just, proper, and equitable.

WHEREFORE, for all the reasons set forth above, the Plaintiff demands judgment against the Defendants, as follows:

1.      Declaring, pursuant to the Declaratory Judgment Act, 38 U.S.C. §§ 2201-02, that the Departments have violated their obligations under the No Surprises Act and the APA by undertaking a series of inappropriate and illegal actions and inactions including, but not limited to, the following:

a.      Failing to compel health plans subject to the No Surprises Act to either make an initial payment to the provider or issue of notice of denial of payment within 30 calendar days after the out-of-network provider transmits its bill to the health plan. *See* 42 U.S.C. §§ 300gg-111(a)(1)(C)(iv) (emergency services), 300gg-111(b)(1)(C) (non-emergency services).

b.      Failing to adopt procedures to monitor health plans' compliance with their obligations under the No Surprises Act to either make an initial payment to the provider or issue of notice of denial of payment within 30 calendar days after the out-of-network provider transmits its bill to the health plan. *See id*.

c.      Failing to compel health plans subject to the No Surprises Act to make initial payments to the out-of-network providers who rendered the medically necessary services, as opposed to the patients. *See id*.

d.      Failing to adopt procedures to monitor health plans' compliance with their obligation under the No Surprises Act to make initial payments to

the out-of-network providers who rendered the medically necessary services, as opposed to the patients. *See id.*

e.     Failing to require health plans to clearly state on their explanation of benefit (EOB) forms their understanding of whether the case is IDR eligible and in which venue (federal or state).

f.     Failing to require health plans to present an exact value of their QPA in the EOB.

g.     Failing to require that health plans engage in meaningful open negotiations with out-of-network providers regarding reimbursement rates, as required by 42 U.S.C. § 300gg-111(c)(1)(A).

h.     Failing to follow and observe the tight time frames established by the No Surprises Act for the IDR process. *See* 42 U.S.C. § 300gg-111(c)(5)(A).

i.     Failing to establish a streamlined process for determining threshold eligibility issues, along with providing an explanation for why a dispute is eligible or ineligible for IDR so as to eliminate roadblocks in the IDR processing system.

j.     Failing to allow a reasonable batching of similarly situated IDR claims.

k.     Failing to follow the provisions of the No Surprises Act and require that reimbursement disputes relating to elective procedures performed in a New York state-located hospital, by an out-of-network provider, on a fully insured health plan beneficiary, who was aware before he or she came to the hospital that the provider was out of network, but chose to proceed anyway, be accepted by and decided through federal IDR process. 42 U.S.C. §§ 300gg-111(a)(3)(H)(i), 300gg-111(a)(3)(I), New York Financial Services Law §§ 601-08.

l.     Failing to require health plans to pay additional reimbursement due providers, as determined through the IDR process, within 30 days, as required by the No Surprises Act. *See* 42 U.S.C. § 300gg-111(c)(6).

m.     Failing to adopt procedures to monitor health plans' compliance with their obligations to require health plans to pay additional reimbursement due providers, as determined through the IDR process, within 30 days, as required by the No Surprises Act. *See id*.

2.     An order under 5 U.S.C. § 706 directing that the Departments:

a.     Compel health plans subject to the No Surprises Act to either make an initial payment to the provider or issue of notice of denial of payment within 30 calendar days after the out-of-network provider transmits its

bill to the health plan. *See* 42 U.S.C. §§ 300gg-111(a)(1)(C)(iv) (emergency services), 300gg-111(b)(1)(C) (non-emergency services).

b.      Adopt procedures to monitor health plans' compliance with their obligations under the No Surprises Act to either make an initial payment to the provider or issue of notice of denial of payment within 30 calendar days after the out-of-network provider transmits its bill to the health plan. *See id.*

c.      Compel health plans subject to the No Surprises Act to make initial payments to the out-of-network providers who rendered the medically necessary services, as opposed to the patients. *See id.*

d.      Adopt procedures to monitor health plans' compliance with their obligation under the No Surprises Act to make initial payments to the out-of-network providers who rendered the medically necessary services, as opposed to the patients. *See id.*

e.      Require health plans to clearly state on their explanation of benefit (EOB) forms their understanding of whether the case is IDR eligible and in which venue (federal or state).

f.      Require health plans to present an exact value of their QPA in the EOBs.

g.      Require that health plans engage in meaningful open negotiations with out-of-network providers regarding reimbursement rates, as required by 42 U.S.C. § 300gg-111(c)(1)(A).

h.      Follow and observe the tight time frames established by the No Surprises Act for the IDR process. *See* 42 U.S.C. § 300gg-111(c)(5)(A).

i.      Establish a streamlined process for determining threshold eligibility issues, along with providing an explanation for why a dispute is eligible or ineligible for IDR so as to eliminate roadblocks in the IDR processing system.

j.      Allow a reasonable batching of similarly situated IDR claims.

k.      Follow the provisions of the No Surprises Act and require that reimbursement disputes relating to elective procedures performed in a New York state-located hospital, by an out-of-network provider, on a fully insured health plan beneficiary, who was aware before he or she came to the hospital that the provider was out of network, but chose to proceed anyway, be accepted by and decided through federal IDR process. 42 U.S.C. §§ 300gg-111(a)(3)(H)(i), 300gg-111(a)(3)(I), New York Financial Services Law §§ 601-08.

l.       Require health plans to pay additional reimbursement due providers, as determined through the IDR process, within 30 days, as required by the No Surprises Act. *See* 42 U.S.C. § 300gg-111(c)(6).

m.     Adopt procedures to monitor health plans' compliance with their obligations to require health plans to pay additional reimbursement due providers, as determined through the IDR process, within 30 days, as required by the No Surprises Act. *See id*.

3.      A writ of prohibition or mandamus, as appropriate, under the All-Writs Act, 28 U.S.C. § 1651(a), directing that the Departments:

a.      Compel health plans subject to the No Surprises Act to either make an initial payment to the provider or issue of notice of denial of payment within 30 calendar days after the out-of-network provider transmits its bill to the health plan. *See* 42 U.S.C. §§ 300gg-111(a)(1)(C)(iv) (emergency services), 300gg-111(b)(1)(C) (non-emergency services).

b.      Adopt procedures to monitor health plans' compliance with their obligations under the No Surprises Act to either make an initial payment to the provider or issue of notice of denial of payment within 30 calendar days after the out-of-network provider transmits its bill to the health plan. *See id.*

c.      Compel health plans subject to the No Surprises Act to make initial payments to the out-of-network providers who rendered the medically necessary services, as opposed to the patients. *See id.*

d.      Adopt procedures to monitor health plans' compliance with their obligation under the No Surprises Act to make initial payments to the out-of-network providers who rendered the medically necessary services, as opposed to the patients. *See id.*

e.      Require health plans to clearly state on their explanation of benefit (EOB) forms their understanding of whether the case is IDR eligible and in which venue (federal or state).

f.      Require health plans to present an exact value of their QPA in the EOBs.

g.      Require that health plans engage in meaningful open negotiations with out-of-network providers regarding reimbursement rates, as required by 42 U.S.C. § 300gg-111(c)(1)(A).

h.      Follow and observe the tight time frames established by the No Surprises Act for the IDR process. *See* 42 U.S.C. § 300gg-111(c)(5)(A).

i. Establish a streamlined process for determining threshold eligibility issues, along with providing an explanation for why a dispute is eligible or ineligible for IDR so as to eliminate roadblocks in the IDR processing system.

j. Allow a reasonable batching of similarly situated IDR claims.

k. Follow the provisions of the No Surprises Act and require that reimbursement disputes relating to elective procedures performed in a New York state-located hospital, by an out-of-network provider, on a fully insured health plan beneficiary, who was aware before he or she came to the hospital that the provider was out of network, but chose to proceed anyway, be accepted by and decided through federal IDR process. 42 U.S.C. §§ 300gg-111(a)(3)(H)(i), 300gg-111(a)(3)(I), New York Financial Services Law §§ 601-08.

l. Require health plans to pay additional reimbursement due providers, as determined through the IDR process, within 30 days, as required by the No Surprises Act. *See* 42 U.S.C. § 300gg-111(c)(6).

m. Adopt procedures to monitor health plans' compliance with their obligations to require health plans to pay additional reimbursement due providers, as determined through the IDR process, within 30 days, as required by the No Surprises Act. *See id*.

4. Declaring, pursuant to the Declaratory Judgment Act, 38 U.S.C. §§ 2201-02, that the Departments have deprived the Practice, and other similarly situated out-of-network providers, of their property without due process of law in violation of the Fifth Amendment of the United States Constitution.

5. A permanent injunction directing that the Departments:

a. Compel health plans subject to the No Surprises Act to either make an initial payment to the provider or issue of notice of denial of payment within 30 calendar days after the out-of-network provider transmits its bill to the health plan. *See* 42 U.S.C. §§ 300gg-111(a)(1)(C)(iv) (emergency services), 300gg-111(b)(1)(C) (non-emergency services).

b. Adopt procedures to monitor health plans' compliance with their obligations under the No Surprises Act to either make an initial payment to the provider or issue of notice of denial of payment within 30 calendar days after the out-of-network provider transmits its bill to the health plan. *See id*.

c. Compel health plans subject to the No Surprises Act to make initial payments to the out-of-network providers who rendered the medically necessary services, as opposed to the patients. *See id.*

d. Adopt procedures to monitor health plans' compliance with their obligation under the No Surprises Act to make initial payments to the out-of-network providers who rendered the medically necessary services, as opposed to the patients. *See id.*

e. Require health plans to clearly state on their explanation of benefit (EOB) forms their understanding of whether the case is IDR eligible and in which venue (federal or state).

f. Require health plans to present an exact value of their QPA in the EOBs.

g. Require that health plans engage in meaningful open negotiations with out-of-network providers regarding reimbursement rates, as required by 42 U.S.C. § 300gg-111(c)(1)(A).

h. Follow and observe the tight time frames established by the No Surprises Act for the IDR process. *See* 42 U.S.C. § 300gg-111(c)(5)(A).

i. Establish a streamlined process for determining threshold eligibility issues, along with providing an explanation for why a dispute is eligible or ineligible for IDR so as to eliminate roadblocks in the IDR processing system.

j. Allow a reasonable batching of similarly situated IDR claims.

k. Follow the provisions of the No Surprises Act and require that reimbursement disputes relating to elective procedures performed in a New York state-located hospital, by an out-of-network provider, on a fully insured health plan beneficiary, who was aware before he or she came to the hospital that the provider was out of network, but chose to proceed anyway, be accepted by and decided through federal IDR process. 42 U.S.C. §§ 300gg-111(a)(3)(H)(i), 300gg-111(a)(3)(I), New York Financial Services Law §§ 601-08.

l. Require health plans to pay additional reimbursement due providers, as determined through the IDR process, within 30 days, as required by the No Surprises Act. *See* 42 U.S.C. § 300gg-111(c)(6).

m. Adopt procedures to monitor health plans' compliance with their obligations to require health plans to pay additional reimbursement due providers, as determined through the IDR process, within 30 days, as required by the No Surprises Act. *See id.*

6.      Declaration pursuant to the Declaratory Judgment Act, 38 U.S.C. §§ 2201-02, that the Departments have taken the private property of the Practice, and other similarly situated out-of-network providers, without just compensation in violation of the Fifth Amendment of the United States Constitution.

7.      Awarding attorney's fees to the Plaintiff in accordance with the provisions of the Equal Access to Justice Act, 28 U.S.C. § 2412(d).

8.      Awarding such other and further relief that the Court deems just, proper, and equitable including, but not limited to, costs, disbursements, and other allowances.

Dated:  Uniondale, New York
        April 20, 2023

                            HARRIS BEACH, PLLC
                            *Attorneys for Plaintiff*

                            By:_____
                                Roy W. Breitenbach
                                Daniel A. Hallak
                                Hannah Levine

                            333 Earle Ovington Boulevard, Suite 900
                            Uniondale, New York 11553
                            (516) 880-8484

TO:

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES
The Hubert H. Humphrey Building
200 Independence Avenue, SW
Washington, DC 20201

UNITED STATES DEPARTMENT OF THE TREASURY

The Treasury Building
1500 Pennsylvania Avenue, NW
Washington, DC 20220

UNITED STATES DEPARTMENT OF LABOR
Frances Perkins Building
200 Constitution Avenue, NW
Washington, DC 20210

THE HON. XAVIER BECERRA
United States Secretary of Health and Human Services
The Hubert H. Humphrey Building
200 Independence Avenue, SW
Washington, DC 20201

THE HON. JANET YELLEN
United States Secretary of the Treasury
The Treasury Building
1500 Pennsylvania Avenue, NW
Washington, DC 20220

THE HON. JULIE A. SU
Acting United States Secretary of Labor
Frances Perkins Building
200 Constitution Avenue, NW
Washington, DC 20210

THE HON. MERRICK B. GARLAND
United States Attorney General
Robert F. Kennedy Department of Justice Building
950 Pennsylvania Avenue, NW
Washington, DC 20530

BREON PEACE, ESQ.
United States Attorney, Eastern District of New York
610 Federal Plaza
Central Islip, NY 11722